**Exhibit A**

1

UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF MARYLAND


------------------------------x

FELIX NIETO,                        :

      Plaintiff,                  : Case No. 1:13-cv-03495-CCB

   v.                              :

ALLIED INTERSTATE, INC.,            :

     Defendants.                  :

------------------------------x


     Deposition of FELIX NIETO, II, a

witness herein, at the law offices of Reed,

Smith, LLP, 1301 13th Street, N.W., 11th Floor,

Washington, D.C., commencing at 9:40 a.m. on

Friday, April 11, 2014, and the proceedings being

taken down by stenotype and transcribed by

Catherine B. Crump, a Notary Public in and for

the District of Columbia.

Nieto, II, Felix                                    April 11, 2014

2

1      APPEARANCES:

2      On behalf of the Plaintiff:

3          FELIX NIETO, II, Pro Se

4

5      On behalf of the Defendant:

6          MICHAEL B. ROBERTS, ESQ.

7          Reed, Smith, LLP

8          1301 K Street, N.W.,

9          Suite 1100

10         Washington, D.C.  20005

11         (202) 414-9288

12         mroberts@reedsmith.com

13

14         STEPHEN T. FOWLER, ESQ.

15         Reed, Smith, LLP

16         3110 Fairview Park Drive

17         Suite 1400

18         Falls Church, Virginia  22042

19         (703) 641-4262

20         sfowler@reedsmith.com

21

22

Nieto, II, Felix                                                    April 11, 2014

                                                                              40

1    complaint starting on June 26th.  So there are four

2    anonymous calls coming into my mobile device starting

3    in June, June 22nd, on the particular documentation

4    that was provided to you, but the ones that were

5    identified by Caller ID that identifies your client

6    as originator started on June 26th.

7         Q.    The four calls you mentioned that you

8    identified as from an anonymous caller --

9         A.    Yes.

10        Q.    Is that correct?

11        A.    I'm looking at them.

12        Q.    You have no way of knowing who initiated

13   those phone calls, do you?

14        A.    That's correct.

15        Q.    And you don't contend that it was the

16   defendant in this case, do you?

17        A.    I have no way of knowing.

18        Q.    With respect to the calls that do have

19   an incoming telephone number, those are the ones that

20   you contend are the subject of this complaint?

21        A.    That's correct.

22        Q.    If I understand your testimony

41

1    correctly, you indicated that those calls began on

2    June 26, 2013; is that correct?

3         A.    **Those are the calls that were made to**

4    **that mobile device.**

5         Q.    Do you contend that there were other

6    calls that are subject to this lawsuit?

7         A.    **They were not subject to -- they were**

8    **not included.  These are the ones that were included.**

9    **The lawsuit specifically referenced the calls off**

10   **this call log.**

11        Q.    And to clarify, you testified that

12   according to your call log, the calls began on June

13   26, 2013?

14        A.    **Correct.**

15        Q.    And your complaint had indicated a date

16   of November 19, 2013.  Are all the calls on your call

17   log that you're looking at now contained within that

18   window between June 26th and November 19, 2013?

19        A.    **All of the calls referencing your client**

20   **are contained within that timeframe.  There are four**

21   **anonymous calls that start back at June 26, but for**

22   **your client's purposes, that was June 26th.**

Nieto, II, Felix                                          April 11, 2014

42

1       Q.      Your complaint alleges that there were

2    30 calls during that time period from June-July 2013

3    through November 2013; is that correct?

4       Sir, I'm just asking.  You don't need to count

5    them.  Your complaint alleges 30 calls; is that

6    correct?

7           **A.      Right.  There are actually 32.**

8       Q.      Your complaint alleges 30 calls; is that

9    correct?

10          **A.      There are 32 on the call logs.**

11      Q.      Your complaint alleges 30 calls; is that

12   correct?

13          **A.      Yes.  I think at that point, more came**

14   **in.  So there's actually, technically, 32, but yes.**

15   **I believe that's correct, that 30 was in there or it**

16   **could have been a typo.  I don't remember.**

17      Q.      You have not amended your complaint

18   since its initial filing; is that correct?

19          **A.      That's correct.  Consider that a freebie**

20   **for your client.**

21      Q.      You've been looking at information on

22   your computer screen to answer the last couple of

1   initial complaint.  So you're asking me to produce

2   something that you already have.  That seems to be an

3   extra burden on me to produce something that you

4   already have in your possession.  This is not new

5   information.

6          Q.    What was your basis in your discovery

7   responses for not producing those documents?

8          A.    That you already have the documents.

9   Why should I reproduce or produce again something

10  that you should already have?  That's extra work on

11  my behalf for something that doesn't need to happen.

12  To me, that's common sense, but maybe because I'm not

13  a lawyer, I don't understand those things.

14         Q.    With respect to the calls that we've

15  been discussing that are listed in Exhibit A to the

16  complaint --

17         A.    Okay.

18         Q.    -- those are the only calls that are the

19  subject of this lawsuit; is that correct?

20         A.    Correct.

21         Q.    What telephone number do you contend

22  those calls were made to?

Nieto, II, Felix                                                April 11, 2014

47

1       A.      ████████-2049.

2       Q.      So to understand your testimony, all of

3   the calls that are at issue in this complaint and in

4   this action, you contend were made to the number

5   ████████-2049; is that correct?

6       A.      Correct.

7       Q.      What is that -- if I refer to that as

8   the 2049 number, will you understand what I'm talking

9   about for shorthand so I don't have to read through

10  ten digits?

11      A.      Sure.  Yes.

12      Q.      With respect to the 2049 number, is that

13  associated with a land line, a cell phone, or some

14  other kind of service?

15      A.      It is comparable to a cellular or mobile

16  radio device.  That basis comes from my experience as

17  a subject matter expert in telecommunications,

18  digital voice communication systems, and a variety of

19  other areas.

20      Q.      Sir, could you please explain what you

21  mean by comparable?

22      A.      So the TCPA lists four or five different

48

1    **radio-type of devices, radio frequency-type of**

2    **devices, that are illegal to make a communication**

3    **with.   They mentioned different technology bases.**

4         **So this device falls within those technology**

5    **bases.   It's comparable to what people, lay people,**

6    **understand as cellular devices, mobile radio, mobile**

7    **paging systems, those kind of things.**

8         Q.    Sir, as a subject matter expert, do you

9    contend that the device that 2049 is associated with

10   is a cellular device?

11        **A.    So if you -- as a subject matter expert,**

12   **and I'll give you my background so that we can**

13   **establish why I can make these particular -- okay.   I**

14   **have 30 years in telecommunications.**

15        Q.    Sir, I'll have questions that will deal

16   with your background.   I want to ask you and clarify,

17   the number 2049 that we've been discussing here

18   today, you contend that that is not associated with a

19   cellular device; is that correct?

20        **A.    It is comparable in technical design to**

21   **what you consider cellular devices.**

22        Q.    What is it?

Nieto, II, Felix                                April 11, 2014

49

1        A.      It's a mobile radio device comparable to

2   cellular, which means it's wireless.  It's has the

3   ability to move.  It has the ability to lock into

4   different signals, different locations, and it has

5   the ability to process digital voice information by

6   cellular.  It has the ability to process, actually,

7   data streams just like cellular systems, the same

8   way.

9        It follows a protocol called Voiceover IP,

10   which is a digital format which transmits a data

11   package that's been digitally converted from an

12   analog capability to a digital.  All the technical

13   systems practically in the market today employ the

14   same technology.

15        The issue of what different people define as

16   cellular or non-cellular is typically words that they

17   understand from what they've heard without being a

18   technology or a technical expert; but in terms of the

19   underlying technical premise of which the data

20   package, the voice package, the digital package

21   transfer, they work in the same way.

22        Q.      So your testimony here today is that the

Nieto, II, Felix                                                April 11, 2014

50

1       cell phone number ▆▆▆▆-2049 was not associated

2       with a cellular device; is that correct?

3              **A.     Say that again.**

4              Q.     I'm asking you to please confirm that

5       the number ▆▆▆▆-2049 is not associated with a

6       cellular device; is that correct?

7              **A.     I do not know your source of data, but**

8       **it is comparable to a cellular device.**

9              Q.     Sir, based on -- you've drawn a

10      distinction here between what you understand to be a

11      cellular device and what you understand to be

12      Voiceover IP; is that correct?

13             **A.      That's not correct.  What I'm**

14      **distinguishing is between a land line and a mobile**

15      **device.  Cellular, mobile, they all follow the same**

16      **premise.  Voiceover IP is just a protocol format that**

17      **cellular phones use to transmit data.**

18             **So Voiceover IP stands for Voiceover Protocol.**

19      **Its digital package can be converted from analog to**

20      **digital and then used in some kind of media to**

21      **transfer the data.  That media in which the data is**

22      **transferred can be cellular or it doesn't matter.**

Nieto, II, Felix                                        April 11, 2014

51

1          In the case of this particular device, it was

2     transmitted through a cellular system also that you

3     would classify both as an internet medium or in terms

4     of a radio device.

5          Q.    Sir, is your testimony here that the

6     number (240) 512-2049 is associated with a cellular

7     device?

8          A.    Let me explain.  It is not a land line.

9          Q.    Sir, that's not question.  My question

10    whether it is a cellular device.

11         A.    It can be associated like a cellular

12    device, that's correct.

13         Q.    If understand your testimony, sir, you

14    are testifying that the number ██████-2049 is not

15    associated with a cellular device; is that correct?

16         A.    Okay.  Let me repeat.

17         Q.    It's a yes or no question, sir.

18         A.    Because the question is not a clear

19    question.  Okay.  So if you ask a question that's not

20    a clear question, then the response is skewed towards

21    a wrong answer that is not the correct answer.  If

22    you want the truth, if you want the actual

52

1   correlation between what you are deeming to be a

2   cellular device or a radio frequency device or

3   cellular whatever compared to a land line, which is

4   where you started this questioning, there is a

5   distinction between a land line and a non-land line

6   device.

7        Q.    Sir, so you understand that there is a

8   distinction between a land line and a non-land line

9   device; that's correct?  You understand there is a

10   distinction; is that correct?

11        A.    There is a distinction, correct.

12        Q.    And you've also drawn a distinction here

13   today between a cellular device and other radio

14   devices; is that correct?

15        A.    I didn't draw a distinction.  I said

16   they were comparable or similar to.

17        Q.    Comparable or similar to does not mean

18   the same thing as same; is that correct?

19        A.    Well, from the technology point of view,

20   it can mean the same.

21        Q.    Sir, I'm asking you with respect to the

22   number 2049, the number we're talking about today, is

Nieto, II, Felix                                                April 11, 2014

56

1    through these three or four carriers, basically, and

2    so other companies contract out.  They contract a

3    billion minutes worth of air time on their system and

4    re-brand it and call it their own.  Virgin Mobile is

5    an example of one, Boost, those.  They do not have

6    their own digital infrastructure.

7         Q.    So if I understand your testimony, ACN

8    contracts with Sprint to use Sprint's network.

9         A.    Correct.

10        Q.    And who is your contract with?

11        A.    For which device?  The 2049 device?

12        Q.    The 2049 device.

13        A.    ACN.

14        Q.    What is that contract for?

15        A.    Digital phone service.

16        Q.    I'm sorry?

17        A.    Digital phone service.  I mean, I don't

18   know.  It's the same kind of thing that Sprint is for

19   my phone here, for digital phone service.

20        Q.    With respect to the 2049 number, did you

21   have that number prior to getting the device we've

22   been talking about?  Did that 2049 number exist on a

Nieto, II, Felix                                    April 11, 2014

72

1    telephone dialing system.

2          So that piece there is just in response to --

3    that's the law, period.  So I wrote notes just to

4    remind me to make sure that those issues were brought

5    up when they come up, just like now.  You brought

6    them up first.

7          Q.    Sir, is it your allegation that the

8    defendant in this case used an automatic telephone

9    dialing system to dial your number?

10         A.    Yes.

11         Q.    Your complaint also made reference to

12   artificial or prerecorded voice.  Is it your

13   contention today that the defendant called you using

14   an artificial or prerecorded voice?

15         A.    Yes.

16         Q.    What is the basis for that belief?

17         A.    So what isn't shown here was they called

18   my other -- this mobile device and started with this,

19   you know, delayed system that kind of signifies an

20   automatic dialer that came with a recorded voice -- a

21   voice recorded mode.  Then someone answered when they

22   realized -- when they call, they call.  They go

Nieto, II, Felix                                            April 11, 2014

73

1   through this delay.  Then the voice system kicks in.

2   If you say nothing, then it says you're acknowledging

3   that you are in receipt of this thing and you accept

4   that you are so and so.  Then someone kicks in on the

5   line afterward.

6        That whole process happened on the 0799, and

7   then immediately, within a day or so, they flipped to

8   this number.

9        Q.   Sir, if I understand correctly, when you

10  were answering that last question, you picked up and

11  held up the device you have here with you today.

12       A.   Correct.

13       Q.   That is not the 2049 number.  Correct?

14       A.   Correct.

15       Q.   So the device you held up today is not

16  the device that's at issue in the litigation; is that

17  correct?

18       A.   But you brought it up in a previous

19  question, 0799, this number.

20       Q.   Sir, I'm asking with respect to the 2049

21  number.

22       A.   Okay.

Nieto, II, Felix                                          April 11, 2014

74

1          Q.    And the calls on the 2049 number that

2     you contend are the subject of this litigation.

3          A.    Okay.

4          Q.    I asked you for the basis for your

5     belief and your allegation that there was an

6     artificial or prerecorded voice used on those

7     telephone calls.  What is the basis for your belief

8     that on the 2049 number, somebody called you using --

9          A.    On the premise that that is how

10    automatic dialing systems work.

11         Q.    What is the basis for your belief?

12         A.    Experience in technology and hearing

13    these systems in the past.

14         Q.    With respect to -- strike that.

15         A.    Can I ask a question that's not on the

16    record?  Or I can ask it on the record.

17         Q.    Please go ahead and ask it on the

18    record.

19         A.    Okay.  So if I have questions that I

20    want to ask during the next round, I can write them

21    here, but you're going to get them anyway.  So you're

22    going to know the question I'm going to ask, and

Nieto, II, Felix                                        April 11, 2014

1        Q.    Sir, in response to Question No. 3,

2    please read your response or the notes that you have

3    next to No. 3.

4        A.    Communicator is just the call log

5    communication.  Is that it?

6        Q.    Is that what it says next to No. 3?

7        A.    Yeah.  Communication is just a call log.

8        Q.    What do you mean by that?

9        A.    That the only communication that I have

10   had with Interstate has been this.  So I did not -- I

11   still don't even know what their basis of their call

12   was to do this other than finding out that they were

13   a collection agency.

14        So they called me.  They haven't defined what

15   they were calling for, what it's in regards to,

16   didn't even say the nature of the business other than

17   they were calling me and making all these calls to my

18   number.

19        Q.    What did they say?

20        A.    Pardon me?

21        Q.    What did they say when you were on the

22   phone with them?

Nieto, II, Felix                                        April 11, 2014

82

1      **A.      The conversation was they represent**

2   **Interstate so and so, and the first thing I told them**

3   **was I do not want you to call me anymore.  That was**

4   **in the initial number to this particular device, not**

5   **in the suit, but it happened on this device.  Then**

6   **after I told them not to call and talk to me anymore,**

7   **they started calling my other device.**

8      Q.      So the record is clear, sir, you've been

9   holding up the cellular device you have with you

10  today, which is the 0799 number; is that correct?

11     **A.      I'm holding the mobile device with 0799.**

12  **That's correct.**

13     Q.      And we clarified previously that that

14  0799 is different than the cellular device -- not the

15  cellular device, the device that you contend has a

16  2049 number; is that correct?

17     **A.      Correct.  They are different physical**

18  **devices.**

19     Q.      So the call you say that you had with

20  Allied Interstate where you told them not to call you

21  anymore, your testimony here is that occurred on the

22  0799 number?

Nieto, II, Felix                                    April 11, 2014

83

1       A.      Correct.

2       Q.      And that did not occur on the 2049

3  number?

4       A.      Correct.

5       Q.      When did that conversation occur on the

6  0799 number?

7       A.      Off my memory, without looking at all

8  the documentation, it was, I believe, in June of last

9  year, but that's as close as I can get without going

10 through and pulling out some fact.

11       So you have to remember that when you go on

12 memory, it's a little hard to get the exact stuff

13 that you write down on some previous thing.  So I'm

14 just going by an proximate time.

15       Q.      Well, putting aside your memory, where

16 would you go to look up that information if you were

17 to look it up?

18       A.      Well, it is possible I could go to the

19 cell phone company and have them pull a detailed log

20 of all the calls that came into the device.  That

21 would probably be my guess as to where you'd get it,

22 because these phones don't hold that kind of data on

Nieto, II, Felix                                    April 11, 2014

86

1   log, which means after it gets to a certain part, it

2   just overwrites.  So now it has a bigger memory card,

3   but I don't think that's in there and it represents

4   too much of an effort to go in and try to find if

5   that number is in there because it's not simple to

6   find.  I don't know what kind of phone you have, but

7   this is kind of an older phone now.

8           Q.     Is it your testimony that it would be

9   difficult to find that information in your phone or

10  that information does not exist in the phone?

11          A.     To the best of my knowledge, I believe

12  it does not exist on the phone.

13          Q.     And you've checked?

14          A.     I have checked, but I haven't done what

15  we call forensic exhaustive tests.

16          Q.     With respect to the call from Allied

17  Interstate to the 0799 number, that's the only time

18  that you asked Allied Interstate to stop calling you;

19  is that correct?

20          A.     That's correct.

21          Q.     If you could turn back to page 4 of

22  Exhibit No. 2.

Nieto, II, Felix                                    April 11, 2014

102

1     where I did not disclose to them that I was involved

2     in a lawsuit and then, of course, then they were,

3     Well, why are you doing that?  But it was sporadic

4     and I said nothing.

5            Q.     I'm sorry.  I don't think I understood

6     your response.

7            A.     They opened my mail.

8            Q.     Who is they?

9            A.     I want to believe it was my ex -- well,

10    my still current wife.

11           Q.     Someone with access to the mailbox?

12           A.     Correct.

13           Q.     Opened your mail before you got it?

14           A.     Correct.

15           Q.     And what happened as a result?

16           A.     Well, she just wrote on there, Oh, I

17    thought this was Felix No. 3, sorry about that, and

18    then she asked me about -- she just said, What is

19    this?  I said nothing.  That was it.

20           Q.     Is Felix No. 3 your son?

21           A.     Yes.

22           Q.     Felix No. 1 would be your father?

103

1       A.      That's correct, but I did not have

2   discussions with them in any capacity to a technical

3   content.  It was just they, obviously, read the

4   correspondence and they said what's this and I said

5   it's nothing.

6       Q.      Did you have a problem with bills not

7   arriving that you expected to arrive?

8       A.      I don't know because it was hard to

9   tell.  In other words, a lot of times, I will get

10  multiple bills from the same -- you know, sometimes

11  you get bills repeated, and in the official phases

12  when was in the transition, sometimes I was late

13  because I didn't get a bill.  I couldn't tell if they

14  delayed it and didn't give me the first one.  It was

15  hard to tell.

16      So the initial moving into 7619 was to kind of

17  establish a differential in between my son with the

18  same as myself.  Sometimes the bills were to just

19  Felix Nieto and not the second, third, whatever.

20      Q.      Sir, what bills were at issue that you

21  were receiving at this point in time?  You indicated

22  you were having trouble receiving bills in the mail.

104

1   What bills would you have been receiving at that

2   point in time?  Would there have been utility bills?

3          A.     No.   Just credit card bills, whatever.

4          Q.     Credit card bills and what else?

5          A.     Mortgage payments for some of my

6   property or whatever.

7          Q.     You say mortgage payments for some of

8   your properties?

9          A.     Correct.  I object to getting personal

10  about something that has nothing to do with this

11  case, just for the record.

12         Q.     Sir, with respect to the mortgage

13  payments for some of your properties, what properties

14  are you talking about?

15         A.     I object on the ground that it has

16  nothing to do with the TCPA lawsuit, nothing

17  whatsoever.

18         Q.     Your objection is noted.  Sir, may I ask

19  you --

20         A.     I have houses in Florida.

21         Q.     How many houses do you have in Florida?

22         A.     Three.